[Civ. No. 4601.   Fourth Dist.   Mar. 11, 1953.]

M. SPOERER, Respondent, v. HARLEY H. BAKER,
Appellant.

Eugene L. Wolver and Johnston, Baker & Palmer for
Appellant.

Deadrich, Gill & Bates for Respondent.

BARNARD, P. J.—This is an action on five notes, each
for $2,000.  These notes, dated June 24, 1949, were given
to the Benders and the Handels and assigned by them to
the plaintiff.  The answer admitted the execution of the
notes but alleged that they were delivered conditionally as
security for the payment of like amounts to the Benders
and the Handels by El Dorado Gold Mines, Ltd., and that
there had subsequently been an accord and satisfaction
through which El Dorado Gold Mines, Ltd. had fulfilled the
obligation and discharged this debt.  The court found that

no part of these notes had been paid and that it was not true that there had been any accord and satisfaction. Judgment was entered for the plaintiff and the defendant has appealed.

The real parties in interest and all of the witnesses were connected with a mining venture in Nevada operated by El Dorado Gold Mines, Ltd. For convenience, this company, will be referred to as El Dorado and the Benders and the Handels, to whom the notes were given, will be referred to as the respondents.

The appellant contends that the findings, to the effect that there was no payment or accord and satisfaction, are unsupported by any material evidence. It is further contended that the court erred in admitting testimony as to certain statements made by a Mr. Wickham with reference to the cancellation of a stock certificate and the reissuance of other stock in lieu thereof; that this evidence was hearsay and inadmissible; and that these statements, had they been admissible, would have been legally insufficient to prove the cancellation of the certificate in question and the reissuance of other stock in lieu thereof. This Mr. Wickham was a stockholder in and an officer of El Dorado, and was active in its business affairs.

The respondents were potato growers at Shafter. On May 7, 1949, they entered into a written agreement with one Kelso, by the terms of which Kelso agreed to issue 100,000 shares of El Dorado stock to the respondents in exchange for certain stock in another company owned by them. On February 15, 1950, the respondents signed a memorandum on the bottom of the May 7th agreement stating, in effect, that this agreement was consummated on that day by giving them El Dorado stock Certificate No. 317 for 100,000 shares. In April, 1950, the respondents received certificates for 100,-000 shares of stock in El Dorado made out in their names, which were dated October 8, 1949, and which are referred to as "Exhibit B." They held this stock at the time of the trial, and Certificate No. 317 had not been returned or cancelled of record. The controversy here is as to whether they obtained "Exhibit B" through this deal with Kelso, or obtained it from El Dorado in exchange for their chattel mortgage and loans, thus wiping out El Dorado's debt to them and the appellant's obligation on these notes.

Prior to June 24, 1949, the respondents had agreed to lend $50,000 to El Dorado, and had received a chattel mortgage

in that amount. They had advanced $35,000 of this amount. On June 24, 1949, the appellant, who was then manager of El Dorado, called on the respondents at Shafter and asked them to advance the $15,000 still due on the chattel mortgage, and also asked them to advance an additional $10,000. The respondents refused to make the additional advance without further security. The appellant gave the respondents these notes for $10,000 as such security, and the respondents gave him checks for $25,000 covering the $15,000 on the chattel mortgage and the additional $10,000, all of which was placed in the corporate funds. On the same day, June 24th, the respondents signed a letter agreeing to release their chattel mortgage upon the receipt of new notes for $60,000 signed by El Dorado and endorsed by the appellant and his wife, with the further condition that these notes were to be given after a resolution of approval by the board of directors and after the respondents had received a full financial statement of the appellant and his wife. On the bottom of that letter, the appellant signed a statement that El Dorado agreed to deliver to the respondents on demand 100,000 shares of stock in El Dorado in compliance with the Kelso agreement (of May 7, 1949). The respondents' letter of June 24, 1949, was given with the understanding that other parties were going to put additional money into the corporation, in which event it would be necessary to have the chattel mortgage released. This additional money was never secured, no new notes were ever signed by El Dorado and none of the conditions of this letter agreement, conditionally providing for the release of the chattel mortgage, was ever performed. The appellant contends, however, that the respondents later agreed to accept stock in El Dorado in lieu of El Dorado's debt to them, and to release their chattel mortgage; that Mrs. Wickham had agreed to contribute stock in El Dorado for this purpose; that the stock finally received by the respondents, "Exhibit B," came from that source, and was issued to the respondents in payment of El Dorado's debt; and that there is no evidence to support the finding to the effect that El Dorado's debt was not fully paid.

One of the respondents, who acted for the others, testified that he received Certificate No. 317 from Kelso on February 15, 1950, in compliance with their agreement dated May 7, 1949; that Certificate No. 317 was in the name of Mrs. Wickham; that she had endorsed it and handed it to Kelso, but Kelso had not had it transferred of record; that at the

next meeting of the board of directors he told them that he had received this certificate and asked what he should do with it and was told that it was cancelled and would be picked up later, and Wickham told him "Your stock is laying in the office at Winnemucca, and the next time you are up there you can pick it up in lieu of this certificate"; and that at the next meeting at Winnemucca in April he was given the other certificates (Exhibit B), at which time Wickham told him "They have been issued and laying here."

At a meeting of the corporation held in Winnemucca on September 17, 1949, the respondent just referred to was elected a director of El Dorado. There is evidence that there was some talk at that meeting about the respondents' releasing their chattel mortgage in exchange for stock in the corporation, and that this respondent said he would have to consult the other respondents and that they might do this if the mine was placed on a paying basis. There was also talk at that time to the effect that Mrs. Wickham had agreed to contribute some stock to be used for this purpose. There is evidence that Mrs. Wickham later contributed 150,000 shares of stock to the corporation, but there is little, if any, evidence as to what was done with that stock.

Mr. Desmond took notes of the proceedings at the meeting on September 17, 1949, and while his notes show that there was a discussion of these things he made no note to the effect that any agreement had been made to accept stock in lieu of the corporation's debt to the respondents. He testified that he could not say that he recalled that this respondent had made any statement that he would accept stock in lieu of the loans. Mr. Roummel, who acted as president at that meeting testified that there was no discussion about trading stock for the mortgage; that he had attended all meetings of the board and the only thing that had been said was that this respondent stated that if the mine was put on a paying basis and if it was agreeable to the other respondents they would make such an exchange; that at a meeting in Stockton in February or March, 1950, this respondent told them he had received a certificate for 100,000 shares from Kelso and asked what to do with it; that Wickham told him it was cancelled, to hold it and he would pick it up, and that his stock in lieu thereof had been made out and he could pick it up at the office in Winnemucca; that at a later date in the office Wickham handed this respondent the other certificates (Exhibit B); that Wickham then asked this respond-

ent to send him the cancelled notes; that this respondent replied that this was an exchange for the cancelled shares that Kelso had, and had nothing to do with the notes in any way, shape or form; and that Wickham ''clammed up and didn't say any more.'' Mr. Stanley, who was president of the corporation during most of the time in question testified that at the meeting on September 17, 1949, Desmond asked this respondent if he would take stock in exchange for the notes they held and this respondent replied that he personally would be willing to do so if the mine was on a paying basis but he would have to consult his partners; that at a later date he heard Wickham tell this respondent that the Kelso certificate was cancelled and for him to keep it until Wickham picked it up; that the new shares (Exhibit B) were then delivered to this respondent; and that these shares (Exhibit B) came from Mrs. Wickham's shares on some outside deal and the corporation itself had no treasury stock at that time.

Kelso testified that he acquired Certificate No. 317 from Mrs. Wickham; that this was his own stock and not the stock Mrs. Wickham had agreed to donate to the corporation; that Certificate No. 317 was in his safe in Sacramento on October 8, 1949, the day on which the other stock certificates (Exhibit B) were dated, and remained there until February 12, 1950; that on February 15, 1950, he transferred Certificate No. 317 to the respondents and endorsed on the back ''This certificate is to be issued to William Kelso and transferred in five equal amounts of 20,000 shares each in the name of Bender and Handel.'' The appellant Baker testified that on June 24, 1949, there was a discussion that the respondents would release their mortgage on receipt of corporation notes for $60,000 endorsed by Baker and his wife, with the further condition that Baker was to furnish a complete financial statement; that a few days later he took the respondent above referred to to the mine for the ''sole purpose of Mr. Bender foreclosing and collecting this $10,-000 and instead of collecting anything he threw it all aside and gave them $500 more''; that on that trip he and this respondent talked about the Kelso agreement and he then told Kelso that he must give this respondent 100,000 shares in El Dorado in accordance with that agreement of May 7, 1949, and Kelso said that he would do so; that on the trip back he asked this respondent to return his notes and this respondent replied that if he foreclosed the mort-

gage they would all lose the money that had been invested in the mine; that this respondent said he would talk to the other respondents when he got back to Shafter and thought they would take the stock to clear the debt but that he could not say until he talked to the others; and that later on, he could not remember when, this respondent said he would destroy the notes.

On May 11, 1950, the respondents received a writing signed by Mr. and Mrs. Wickham stating that the respondents have the option to exchange their chattel mortgage and notes from El Dorado for stock in El Dorado at $1.00 per share; that Mrs. Wickham "will furnish the stock to cover the above"; and that "This option is good for a period of ninety days from date—up to and including August 11th, 1950."

While the evidence shows that the stock certificates finally received by the respondents (Exhibit B) were dated October 8, 1949, and that they were being held in the office of the company at Winnemucca, there is no evidence that the respondents ever agreed to accept those shares in exchange for the corporation's debt to them. No reason is suggested why certificates should have been made out for 100,000 shares for that purpose when such talk as there was contemplated only the delivery of 60,000 shares. There is very clear evidence that the respondents received these shares (Exhibit B) in exchange for Certificate No. 317 which he received from Kelso in compliance with their agreement of May 7, 1949. The evidence shows that the affairs of this corporation were being very loosely conducted and the fact that Certificate No. 317 was not cancelled of record, as it should have been, could have no controlling effect on the issues of this case. The evidence clearly shows that the respondents received only one block of 100,000 shares of stock in connection with these transactions, and not two separate blocks, and fully supports the implied finding and conclusion that they received these 100,000 shares from Kelso in compliance with their agreement with him, and not from El Dorado in exchange for the corporation's debts to them.

No reversible error appears in connection with the admission of testimony which was objected to with respect to certain statements made by Mr. Wickham with reference to the cancellation of Certificate No. 317 and the issuance of other stock in lieu thereof. Other evidence to the same effect was received from other witnesses without objection, and the statements were made at meetings of the board of

directors in the course of business and as a part of the transaction in question. Moreover, no prejudice appears as the other evidence is ample, irrespective of any such cancellation of record, to support the court's findings.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 7, 1953.